CORRIGAN, J., Dissenting.
I respectfully dissent. I would hold that Dr. George Bolduc’s autopsy report was sufficiently formal and primarily made for an evidentiary purpose, as the United States Supreme Court has explicated those terms to date. Dr. Bolduc’s report contained anatomical observations about which another forensic pathologist testified. High court authority compels the conclusion that admitting this testimony violated defendant’s confrontation rights.
Dr. Bolduc performed an autopsy on Lucinda Pina and prepared an autopsy report with accompanying photographs. We have taken judicial notice of that report, which is not certified. The prosecution did not call Dr. Bolduc as a witness, presenting instead Dr. Robert Lawrence. The prosecution did not indicate that Dr. Bolduc was unavailable, and defendant objected to the witness substitution. Defense counsel’s hearsay objection to Dr. Lawrence’s testimony was overruled.
Dr. Lawrence told the jury that he relied on Dr. Bolduc’s autopsy report and accompanying photographs as a basis for his testimony. Neither the report nor photographs were admitted in evidence. Although he had not been present during the procedure, Dr. Lawrence testified about the condition of Pina’s body at the time of the autopsy. These statements about the body’s condition were presented as facts, about which Dr. Lawrence had no personal knowledge.
Whether Dr. Lawrence’s testimony violated defendant’s Sixth Amendment right to confrontation turns on whether Dr. Lawrence related testimonial hearsay. In Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (Crawford), the Supreme Court established that it is the “testimonial” nature of a statement that gives rise to Sixth Amendment protections.[1] The Supreme Court has yet to clearly define just what the term “testimonial” means.
Nevertheless, I agree with the majority that the Supreme Court’s Crawford jurisprudence reflects the importance of two factors in determining whether a *634 statement is testimonial: (1) the degree of formality or solemnity of the statement and (2) the primary purpose for which the statement is made.
Applying those two factors, I conclude the anatomical observations contained in Dr. Bolduc’s autopsy report were testimonial statements. The prosecution asked Dr. Lawrence to relate facts about the condition of Pina’s body. To the extent those facts were drawn from Dr. Bolduc’s report, as opposed to observations based on the autopsy photographs, Dr. Lawrence related testimonial hearsay in violation of defendant’s federal constitutional right to confront and cross-examine Dr. Bolduc.
Although the majority notes that Dr. Lawrence also relied on autopsy photographs for his testimony, the record is insufficient to establish that the photographs provided an independent basis for Dr. Lawrence’s testimony.
A. Dr. Bolduc’s Recorded Observations Were Sufficiently Formal
In Crawford, the Supreme Court made clear that “not all hearsay implicates the Sixth Amendment’s core concerns.” (Crawford, supra, 541 U.S. at p. 51.) The court observed that core testimonial statements covered by the confrontation clause include “ ‘ex parte in-court testimony or its functional equivalent,’ ” using an affidavit as an example. (Crawford, at p. 51.)
Applying the Crawford analysis to forensic evidence, the United States Supreme Court has determined that affidavits reporting results of forensic analysis are sufficiently formal (Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305, 310-311 [174 L.Ed.2d 314, 129 S.Ct. 2527]) (Melendez-Diaz), as are unsworn certificates (Bullcoming v. New Mexico (2011) 564 U.S._,._. [180 L.Ed.2d 610, 131 S.Ct. 2705, 2717]) (Bullcoming). In Melendez-Diaz, a Massachusetts statute allowed state crime laboratory technicians to record their test results in a sworn affidavit. Under the statute, these affidavits were admitted to prove the test results. The technicians did not testify and thus were not subject to cross-examination. (See Melendez-Diaz, at pp. 308-309.) Similarly in Bullcoming, New Mexico applied municipal and magistrate court rules that allowed certified reports into evidence without a technician’s testimony. (See Bullcoming, supra, at p._ [131 S.Ct. at p. 2717].) These state-created procedures were quite similar, in some respects, to the ex parte procedure of the Marian statutes, which the Crawford court observed was the “principal evil at which the Confrontation Clause was directed.” (Crawford, supra, 541 U.S. at p. 50.)
However, whether uncertified reports are sufficiently formal to be considered testimonial remains an open question. In Williams v. Illinois (2012) 567 U.S. _ [183 L.Ed.2d 89, 132 S.Ct. 2221] (Williams), the high court *635 considered statements made in an uncertified Cellmark laboratory report, relied upon by an expert witness for her testimony. The report was not introduced into evidence. (Id. at p. _ [132 S.Ct. at p. 2235].) Before considering whether the Cellmark report amounted to testimonial hearsay, the plurality opined that the report was not hearsay at all because its contents were not admitted for their truth. (Williams, supra, at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).)[2] This conclusion did not gamer a majority. Five justices explicitly repudiated that analysis. (See Williams, at pp. - [132 S.Ct. at pp. 2256-2259] (cone. opn. of Thomas, J.); id. at pp. - [132 S.Ct. at pp. 2268-2272] (dis. opn. of Kagan, J.).)[3]
The Williams plurality offered an alternative analysis as well. Even if the Cellmark report had been introduced for its truth, the report failed to satisfy the plurality’s formulation of primary purpose. (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) The primary purpose test is discussed below. What is important to note here is that, in offering its alternative analysis, the plurality did not discuss whether the Cellmark report was sufficiently formal.
Justice Thomas provided the dispositive fifth vote in Williams. He did so only because the Cellmark report “lacked the requisite ‘formality and solemnity’ to be considered ‘ “testimonial.” ’ ” (Williams, supra, 567 U.S. at p._ [132 S.Ct. at p. 2255] (cone. opn. of Thomas, J.).) In joining the plurality’s outcome, Justice Thomas emphasized his strict position “that the Confrontation Clause reaches ‘ “formalized testimonial materials,” ’ such as depositions, affidavits, and prior testimony, or statements resulting from ‘ “formalized dialogue,” ’ such as custodial interrogation.” (Id. at p._[132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).) Justice Thomas has articulated this position in Davis v. Washington (2006) 547 U.S. 813, 836-837 [165 L.Ed.2d 224, 126 S.Ct. 2266] (dis. opn. of Thomas, J.) (Davis); Melendez-Diaz, supra, 557 U.S. at page 329; and Michigan v. Bryant (2011) *636 562 U.S. _, _ [179 L.Ed.2d 93, 131 S.Ct. 1143, 1165] (conc. opn. of Thomas, J.) (Bryant). Under Justice Thomas’s interpretation, “although the [Cellmark] report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation.” (Williams, supra, at p. _ [132 S.Ct. at p. 2260] (cone. opn. of Thomas, J.).)
Justice Kagan, writing for the dissenters, expressly rejected Justice Thomas’s formality analysis. Comparing the Cellmark report to the unsworn report in Bullcoming, supra, 564 U.S._[131 S.Ct. 2705], Justice Kagan stated: the differences “amount[] to (maybe) a nickel’s worth of difference: The similarities in form, function, and purpose dwarf the distinctions. [Citation.] Each report is an official and signed record of laboratory test results, meant to establish a certain set of facts in legal proceedings. Neither looks any more ‘formal’ than the other; neither is any more formal than the other. . . . The difference in labeling—a ‘certificate’ in one case, a ‘report of laboratory examination’ in the other—is not of constitutional dimension.” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.).)
So the question remains: For purposes of the Sixth Amendment confrontation clause, can a statement in an uncertified document be formal enough to qualify as testimonial? In the absence of any Supreme Court majority definitively answering this question, we must do so. We answer it in light of the entire Crawford jurisprudence and our own application of it.
The Crawford court explained that testimony “is typically ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” (Crawford, supra, 541 U.S. at p. 51, italics added.) “Various formulations of this core class of ‘testimonial’ statements exist: ‘ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,’ [citation]; ‘extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,’ [citation]; ‘statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,’ [citation].” (Crawford, supra, 541 U.S. at pp. 51-52.)
But the high court emphasized that “[statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.” (Crawford, supra, 541 U.S. at p. 52, italics added.) “The statements are not sworn testimony, but the absence of oath was not dispositive.” (Ibid.)
*637 In Davis, supra, 547 U.S. 813, the court again emphasized that testimonial hearsay is not limited to “the most formal sort—sworn testimony in prior judicial proceedings or formal depositions under oath . . . .” (Id. at p. 826.) “[W]e do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman recite the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition.” (Davis, at p. 826.) “The product of [police] interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial.” (Ibid.) The court noted that “[t]he solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood. [Citations.]” (Ibid.)
Davis, supra, 547 U.S. 813, involved two consolidated cases in which domestic violence victims made statements to government authorities. In one of those cases, Hammon v. Indiana, police responded to a domestic violence report and came upon the defendant’s wife standing outside her house. Although frightened, she told the officers that “ ‘ “nothing was the matter.” ’ ” (Davis, at p. 819.) The officers eventually interviewed her inside the home, keeping her separated from her husband in another room. She wrote and signed a “ ‘battery affidavit,’ ” summarizing an assault. (Id. at p. 820.) When the wife failed to appear at her husband’s trial, her oral and written statements were admitted through the police officer who had questioned her. (Davis, at pp. 820-821.)
The Supreme Court concluded the statements were “formal enough” to qualify as testimonial because of the circumstances surrounding the interrogation. (Davis, supra, 547 U.S. at p. 830.) The statements were made during organized and structured questioning in a separate room; inquiry focused on past events that were potentially criminal; and the officer received the wife’s replies for use in the investigation. (Ibid.) “Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial.” (Ibid.)
The other case decided in Davis concerned statements made by a domestic violence victim to a 911 operator. In concluding that these statements were not sufficiently formal, the court contrasted them with Crawford's police station interrogation: “Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; [the Davis victim’s] frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.” (Davis, supra, 547 U.S. at p. 827.)
*638 In People v. Cage (2007) 40 Cal.4th 965 [56 Cal.Rptr.3d 789, 155 P.3d 205], this court applied Davis to determine whether a victim’s hearsay statements to a sheriff’s deputy were testimonial. We explained that Davis demonstrates that “though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony.” (Cage, at p. 984, italics added.) In Cage, a sheriff’s deputy interviewed an assault victim at a hospital emergency room, more than an hour after the assault. (Id. at p. 985.) The circumstances of the interview “were relatively informal, but they were no less formal or structured than the residential interview of Amy Hammon in Davis. Here, as there, the requisite solemnity was imparted by the potentially criminal consequences of lying to a peace officer.” (Cage, at p. 986, fn. omitted.)
In Bryant, supra, 562 U.S._[131 S.Ct. 1143], police came upon a man lying in a parking lot, bleeding from gunshot wounds. The Supreme Court majority concluded his statements identifying his shooter were not testimonial because their primary purpose was to enable police to respond to an ongoing emergency. (Id. at pp. - [131 S.Ct. at pp. 1163-1167].) Addressing the issue of formality, the court noted that questioning occurred in an exposed, public area, in a disorganized fashion, before emergency medical services arrived. Thus, the circumstances were factually distinguishable from a formal station house interrogation. The court cautioned that “informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent.” The Bryant majority referred to Davis’ s explanation that attempting to keep a written interrogation “informal” by not asking the declarant to sign it will not serve to evade confrontation clause protections. (Bryant, supra, at p._[131 S.Ct. at p. 1160], citing Davis, supra, 547 U.S. at p. 826.)
In Bullcoming, supra, 564 U.S. _ [131 S.Ct. 2705], the high court refused to distinguish between the unsworn laboratory certificate before it and the affidavits offered in Melendez-Diaz. The court noted Crawford’s observation that the absence of an oath is not controlling when determining whether a statement is testimonial. (Bullcoming, supra, at p. _ [131 S.Ct. at p. 2717].) The court pointed out that the analyst’s certificate was “ ‘formalized’ in a signed document, [citation], headed a ‘report.’ ” The report form contained a legend referring to the applicable court rules permitting admission of certified blood-alcohol analyses. “In sum, the formalities attending the ‘report of blood alcohol analysis’ are more than adequate to qualify [the analyst’s] assertions as testimonial.” (Ibid., italics added.)
With this background in mind, we turn to the autopsy report prepared by Dr. Bolduc. During the autopsy, he examined Pina’s body and ultimately included his observations as to her physical condition in his written report. At *639 trial, Dr. Lawrence gave his opinion that Pina died by strangulation. In explaining that conclusion, he related, as matters of fact, Dr. Bolduc’s observations of Pina’s body as they were set out in the autopsy report. In particular, Dr. Lawrence mentioned the hemorrhages in Pina’s eyes and neck, the purple color of her face, the absence of any natural disease causing death, the fact that she had bitten her tongue shortly before death, and the absence of any fractures in the larynx and hyoid bone. As to the latter, Dr. Bolduc wrote: “There are no fractures of the hyoid bone, thyroid or cricoid cartilages.”
The majority states: “An autopsy report typically contains two types of statements: (1) statements describing the pathologist’s anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist’s conclusions as to the cause of the victim’s death. The out-of-court statements at issue here—pathologist Bolduc’s observations about the condition of victim Pina’s body—all fall into the first of the two categories. These statements, which merely record objective facts, are less formal than statements setting forth a pathologist’s expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature.” (Maj. opn., ante, at p. 619.)[4]
The majority creates a distinction between two kinds of statements in the autopsy report: observations and conclusions. The majority appears to suggest that while conclusions may be formal, observations are not. There are several problems with this analysis. First, it conflates the two prongs of the testimonial determination: formality and primary purpose. The formality prong looks to the circumstances under which the statement is made and any efforts to enhance the statement’s formality by having it sworn (Melendez-Diaz, supra, 557 U.S. 305), certified (Bullcoming, supra, 564 U.S._[131 S.Ct. 2705]), or signed (Davis, supra, 547 U.S. 813). The formality prong turns on the circumstances of the statement’s production and preservation rather than its content.[5]
Second, the distinction the majority offers here was rejected in Bullcoming, supra, 564 U.S._[131 S.Ct. 2705]. Justice Ginsburg, joined by four other justices on this point, wrote: “Most witnesses, after all, testify to their *640 observations of factual conditions or events, e.g., ‘the light was green,’ ‘the hour was noon.’ Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact—Bullcoming’s counsel posited the address above the front door of a house or the read-out of a radar gun. [Citation.] Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department’s standard operating procedures? As our precedent makes plain, the answer is emphatically ‘No.’ ” (Id. at pp. - [131 S.Ct. at pp. 2714-2715].)
Further, the Bullcoming majority noted that while “[t]he New Mexico Supreme Court stated that the number registered by the gas chromatograph machine called for no interpretation or exercise of independent judgment on [the analyst’s] part,” the “analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess ‘the scientific acumen of Mme. Curie and the veracity of Mother Teresa.’ ” (Bullcoming, supra, 564 U.S. at p._[131 S.Ct. at p. 2715].)
We are not called upon in this matter to determine whether every aspect of the autopsy report was testimonial. The question here is whether anatomical observations Dr. Bolduc made are sufficiently formal in light of the circumstances in which they were made and the document in which they were recorded. In many cases, Government Code section 27491.4, subdivision (a) gives a coroner discretion whether to conduct an autopsy. Once that discretion is exercised, the statute requires: “The detailed medical findings resulting from an inspection of the body or autopsy by an examining physician shall be either reduced to writing or permanently preserved on recording discs or other similar recording media, shall include all positive and negative findings pertinent to establishing the cause of death in accordance with medicolegal practice and this, along with the written opinions and conclusions of the examining physician, shall be included in the coroner’s record of the death.” (Gov. Code, § 27491.4, subd. (a).)
Dr. Bolduc performed this autopsy and prepared a report in compliance with Government Code section 27491.4, subdivision (a). He was working for the Sheriff-Coroner of San Joaquin County, and the report is identified as a document filed with the San Joaquin County Sheriff-Coroner’s Office. An autopsy report is a public record. (See Dixon v. Superior Court (2009) 170 Cal.App.4th 1271, 1278 [88 Cal.Rptr.3d 847].)
Dr. Bolduc’s autopsy report consists of seven pages. The top of the first page bears the preprinted notation “Office of Sheriff-Coroner, County of San Joaquin.” That same page contains a reproduction of the badge of the San *641 Joaquin County Sheriff, below which is the name “Robert Heidelbach, Sheriff-Coroner, Public Administrator.”
Additionally, the first page of the autopsy report identifies the document as “Coroner’s Autopsy Report.” In the upper right-hand comer of each subsequent page is the identification “Coroner’s Autopsy Report.” Dr. Bolduc’s name is printed on the bottom of each page.
The report provides a detailed summary of the external examination of the victim, concluding with “Findings Consistent With Neck Compression.” The report then provides a detailed summary of the internal examination, including the description of the injuries to the neck and the absences of fractures “of the hyoid bone, thyroid or cricoid cartilages.”
The report concludes with nine “Autopsy Findings.” The first “finding” states: “The autopsy findings are consistent with neck compression for the following reasons,” and lists six reasons. The report states, “Cause of Death: Asphyxia (minutes) [sic\; Due to: Neck compression.” The report is signed by “George E. Bolduc, M.D.,” and dated June 8, 2006.
In terms of formality, Dr. Bolduc’s autopsy report comports closely with the court’s description of “testimonial” in Bullcoming, supra, 564 U.S. _ [131 S.Ct. 2705], There, the analyst’s certificate, although unsworn, was “ ‘formalized’ in a signed document, [citation], headed a ‘report,’ ” and these attendant formalities were found “more than adequate to qualify [the analyst’s] assertions as testimonial.” {Id. at p. _ [131 S.Ct. at p. 2717].) Although Dr. Bolduc’s “Coroner’s Autopsy Report” is not certified, it is signed and dated. It is manifestly an official report, prepared by Dr. Bolduc as an agent of the Sheriff-Coroner and in compliance with the Government Code. I believe the document and the circumstances of its preparation reveal that the statements at issue here are sufficiently formal to satisfy that prong of the Supreme Court’s testimonial test.
B. Dr. Bolduc’s Recorded Observations Satisfy the Primary Purpose Test
In Williams, supra, 567 U.S. _ [132 S.Ct. 2221], all members of the Supreme Court agreed that the primary purpose for which a statement is made is an important prong of the testimonial test. Beginning with Crawford, supra, 541 U.S. 36, the high court has declined to provide a firm definition of “testimonial.” In Williams, three different formulations were given.
Justice Alito, for the plurality, wrote that even if the Cellmark report had been introduced for its truth, it was not testimonial because it was not *642 prepared for “the primary purpose of accusing a targeted individual.” (Williams, supra, 567 U.S. at p. __ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) This formulation garnered a total of four votes, as Justice Alito was joined by Chief Justice Roberts and Justices Kennedy and Breyer. (Id. at p._[132 S.Ct. at p. 2227].) Under the plurality’s definition, a statement is not testimonial unless it was made to accuse a specific person.
Justice Thomas rejected that definition. He agreed that for a statement to qualify as testimonial, it must be made with a requisite primary purpose, which he described thusly: “[F]or a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution.” (Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2261] (conc. opn. of Thomas, J.).)[6] He criticized the accusatory statement concept newly formulated by the plurality because it “lacks any grounding in constitutional text, in history, or in logic.” (Williams, at p._[132 S.Ct. at p. 2262] (conc. opn. of Thomas, J.).)
Justice Kagan, in a dissent joined by Justices Scalia, Ginsburg, and Sotomayor, also rejected the plurality’s definition of the primary purpose test. Justice Kagan wrote, “Where that test comes from is anyone’s guess. Justice Thomas rightly shows that it derives neither from the text nor from the history of the Confrontation Clause. [Citation.] And it has no basis in our precedents. We have previously asked whether a statement was made for the primary purpose of establishing ‘past events potentially relevant to later criminal prosecution’—in other words, for the purpose of providing evidence. Davis, 547 U.S., at 822 [126 S.Ct. 2266]; see also Bullcoming, 564 U.S., at _[131 S.Ct., at 2705]; Bryant, 562 U.S., at_,_[131 S.Ct. 1143, at p. 1157]; Melendez-Diaz, 557 U.S., at 310-311 [129 S.Ct. 2527]; Crawford, 541 U.S., at 51-52 [124 S.Ct. 1354], None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual; indeed, in Melendez-Diaz, we rejected a related argument that laboratory ‘analysts are not subject to confrontation because they are not “accusatory” witnesses.’ 557 U.S., at 313, 129 S.Ct. 2527.” (Williams, supra, 567 U.S. at pp. - [132 S.Ct. at pp. 2273-2274] (dis. opn. of Kagan, J.).)
In Williams, supra, 567 U.S._[132 S.Ct. 2221], the high court failed to articulate any reasoning accepted by a majority of that court. “ ‘When a fragmented Court decides a case and no single rationale explaining the result *643 enjoys the assent of five Justices, “the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds ....”’ (Marks v. United States (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 97 S.Ct. 990].)” (Del Monte v. Wilson (1992) 1 Cal.4th 1009, 1023 [4 Cal.Rptr.2d 826, 824 P.2d 632].) “This rule only works in instances where ‘one opinion can meaningfully be regarded as “narrower” than another—only when one opinion is a logical subset of other, broader opinions,’ King v. Palmer, ... 292 U.S. App.D.C. 362 [950 F.2d 771, 781] (D.C.Cir. 1991) (en banc), that is to say, only when that narrow opinion is the common denominator representing the position approved by at least five justices. When it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court. [Citation.] [f] . . . The only binding aspect of such a splintered decision is its specific result. . . .” (U.S. v. Alcan Aluminum Corp. (2d Cir. 2003) 315 F.3d 179, 189.)
As Justice Kagan wrote in Williams, supra, 567 U.S._[132 S.Ct. 2221], “. . . I call Justice Alito’s opinion ‘the plurality,’ because that is the conventional term for it. But in all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication.” (Id. at p._[132 S.Ct. at p. 2265] (dis. opn. of Kagan, J.).)
Because the high court failed to articulate any reasoning carrying a majority of that court, Williams provides no authoritative reasoning for us to follow. Nevertheless, despite the fractured voting, Williams represents the first time that all nine justices agree that primary purpose is a significant part of the “testimonial” analysis. So how do we determine whether the “primary purpose” for which a statement was given satisfies that prong of the testimonial test?
We must apply the high court’s binding decisions in this area. The four dissenting justices in Williams continue to adhere to the primary purpose test articulated in Davis, supra, 547 U.S. 813. (See Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2274] (dis. opn. of Kagan, J.).) As set out above, ante at pages 635-636, Justice Thomas provides a definition slightly different from that endorsed by the dissenters. While future developments may clarify whether those differences result in a legally significant distinction, the similarity between the two formulations is sufficient to consider them together here.
The primary purpose test of Davis was again applied by the Supreme Court majority in Bryant, supra, 562 U.S._[131 S.Ct. 1143]. The court further explained that “[a]n objective analysis of the circumstances of an encounter *644 and the statements and actions of the parties to it provides the most accurate assessment of the ‘primary purpose of the interrogation.’ The circumstances in which an encounter occurs ... are clearly matters of objective fact.” (Bryant, supra, at p._[131 S.Ct. at p. 1156].)[7]
In view of the binding precedent of the high court, I suggest the appropriate inquiry is whether, viewed objectively, a sufficiently formal statement was made for the primary purpose of establishing or proving past facts for possible use in a criminal trial.
Turning to Dr. Bolduc’s autopsy, the majority states: “The usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes.” (Maj. opn., ante, at p. 621.)
Such a blanket approach is not supported by controlling precedent. While some autopsies may be conducted for purposes unrelated to a criminal prosecution, other autopsies conducted under different circumstances may well result in the production of testimonial statements. In Bryant, supra, 562 U.S. __[131 S.Ct. 1143], Justice Sotomayor, writing for the majority, notes that the primary purpose for which a statement is made will often be highly fact dependent.[8] Indeed, the primary purpose may change as events evolve. The Bryant court, citing Davis, supra, 547 U.S. at page 828, pointed out that a conversation initially concerning the need for emergency assistance may evolve to produce testimonial statements.[9] Further, a statement may be made or recorded for multiple purposes. (See Bryant, supra, at p.__ [131 S.Ct. at p. 1161].) However, it is the primary purpose that must be determined and that determination will drive the analysis.
*645 Thus, the question is whether this autopsy report was made for the primary purpose of establishing past facts for possible use in a criminal trial. Answering that question, “we objectively evaluate the circumstances” in which the report was generated. (Bryant, supra, 562 U.S. at p._[131 S.Ct. at p. 1156].)
An objective consideration of this autopsy report reveals the following. Dr. Bolduc’s autopsy of Pina’s body took place over two days during a homicide investigation. There is no dispute that the victim, whose body was discovered in her parked car after a police search, was a homicide victim. The report reveals that Homicide Detective Robert Paine was present throughout the autopsy. It indicates that, at various times during the second day of the procedure, another police officer, an evidence technician, and a Department of Justice representative were also present. Paine testified at the preliminary hearing that he told Dr. Bolduc about the position and appearance of Pina’s body in the car. Dr. Bolduc’s autopsy report relates: “This woman, dressed in pajamas and socks, was found on the rear floorboard of her SUV covered by a blanket. The windows were closed and the doors were locked.” The report also notes: “History from police Detective Paine that someone confessed to manually strangling the deceased from the front and putting the body in her SUV and driving around for a while.” In light of all these circumstances, I conclude that when Dr. Bolduc wrote this autopsy report, his primary purpose was to make the statements at issue to establish facts for possible use in a criminal trial.[10]
While Justice Werdegar joins the majority opinion, she writes separately to explain in more detail why Dr. Bolduc’s statements are not testimonial. The explanation offered is problematic.
First, on the issue of formality, the concurrence relies on standards attributed to the National Association of Medical Examiners (NAME Standards). Those standards appear nowhere in the record. The trial court did not rely on them. No statute mentions them. We cannot determine from this record whether those standards are widely accepted in California. We have no basis to conclude those standards are implicated in this case.
On the primary purpose question, the concurrence asserts there is a “consensus” that a statement is more testimonial “to the extent it was produced under circumstances making it likely to be used in place of live *646 testimony at a future criminal trial.” (Conc. opn. of Werdegar, J., ante, at p. 624.) It is inaccurate to say there is a consensus among the justices as to the definition of “primary purpose.” The definition has been formulated variously in Crawford and subsequent cases. As noted, three different formulations are contained in the Williams opinion alone.
The precise phrasing of the test is important, even if the high court has yet to agree upon one. Articulating the test in different ways gives rise to confusion. I suggest it is unwise for us to try and synthesize the court’s many formulations to urge there is a consensus, where plainly one does not exist.
The concurrence again places heavy reliance on the NAME Standards to conclude that a medical examiner may make a “ ‘neutral and objective medical assessment’ ” when doing an autopsy. (Conc. opn. of Werdegar, J., ante, at p. 625.) Regardless of how an association may characterize what some medical examiners may generally do, the question before us is what this doctor did, and for what primary purpose he wrote this autopsy report. There is no evidence in this record that Dr. Bolduc followed the NAME Standards, or relied on them in any way. As explained in the majority opinion (ante, at pp. 613-614) the pretrial evidentiary hearing contains assertions that Dr. Bolduc was fired as a coroner in Kern County, did not reveal that fact in his resume, and resigned his coroner’s position in Orange County “ ‘under a cloud.’ ” Dr. Lawrence acknowledged at that hearing that prosecutors in several counties refused to use him as an expert witness.
The concurrence’s statement that there is no indication that Dr. Bolduc “was guided in his conduct and documentation of the autopsy by anything other than professional medical practices and standards” (cone. opn. of Werdegar, J., ante, at p. 627) rests on complete speculation. Indeed, it is precisely those questions that could have been pursued during his cross-examination had the prosecution not declined to call Dr. Bolduc as a witness.
C. Prejudicial Effect of the Error
The majority notes that Dr. Lawrence did not say whether his description of Pina’s body at the time of the autopsy was based solely on the autopsy photographs, solely on Dr. Bolduc’s autopsy report, or on a combination of the two. (Maj. opn., ante, at p. 614.) The existence of multiple sources is important.
Autopsy photographs are not hearsay. Hearsay is an out-of-court “statement.” (See Evid. Code, § 1200.) Evidence Code section 225 defines “statement” as oral or written verbal expression or nonverbal conduct of a person. Only people can generate hearsay. Machines, animals, chemical reactions *647 cannot. (See Simons, Cal. Evidence Manual (2012 ed.) § 2.2, pp. 74—75.) Therefore, to the extent Dr. Lawrence had used properly authenticated autopsy photographs to explain his testimony, he would not have disclosed testimonial hearsay.[11]
On this record, supplemented by our review of the judicially noticed autopsy record, it cannot be determined if the autopsy photographs would have independently supported Dr. Lawrence’s testimony. The photographs were not admitted in evidence, and Dr. Bolduc’s report did not mention them other than to note that “[m]ultiple photographs are taken.” Defendant objected to Dr. Lawrence’s testimony as hearsay. It was the prosecution’s burden, as proponent of the challenged evidence, to establish its admissibility. (See Pen. Code, § 1096.) It failed to do so.
When the erroneous admission of evidence against a criminal defendant violates a right under the federal Constitution, the judgment must be reversed unless the prosecution shows beyond a reasonable doubt that the result would have been the same notwithstanding the error. (Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) Applying that test here, I conclude that the erroneously admitted testimony of Dr. Lawrence was prejudicial.
As the Court of Appeal explained, Dr. Lawrence’s opinion that Pina was strangled for at least two minutes was a crucial part of the prosecution’s case: “While defendant admitted strangling Pina to death, he said he did so only after he was provoked to the point of losing control and argued he was guilty of at most voluntary manslaughter. The prosecution’s argument that defendant was guilty of intentional murder, and not voluntary manslaughter, was based in large part on the theory that during the time it took for defendant to strangle Pina, what may have begun as passion shaded into intent. The only evidence offered by the prosecution in support of this theory was Dr. Lawrence’s testimony that Pina was strangled for at least two minutes before she died, which he based on Dr. Bolduc’s report. The prosecutor relied on that testimony, during her closing argument in arguing defendant was guilty of murder and not voluntary manslaughter.”
Dr. Lawrence’s description of Pina’s body, drawn from the hearsay contained in Dr. Bolduc’s autopsy report, violated defendant’s right to confront and cross-examine Dr. Bolduc. Had the trial court excluded that description, there would have been no evidence supporting Dr. Lawrence’s opinion *648 regarding the length of Pina’s strangulation.[12] Without such evidence, the jury might have rejected the prosecutor’s argument (maj. opn., ante, at p. 615) that defendant could not have killed Pina in the heat of passion because any such passion would have dissipated during the two minutes it took to strangle her.
I would affirm the judgment of the Court of Appeal.
In reaching this conclusion I note that various Supreme Court justices have written at length describing how the court’s Crawford jurisprudence has created serious and complicated problems, the full significance of which continues to evolve.[13] As Justice Alito observed in Williams, “Experience might yet show that the holdings [in Crawford’s progeny] should be reconsidered for the reasons, among others, expressed in the dissents the decisions produced.” (Williams, supra, 567 U.S. at p._, fn. 13 [132 S.Ct. at p. 2242, fn. 13] (plur. opn. of Alito, J.).)
Application of Supreme Court precedent is further complicated by the fact that the tests propounded are expressed in various formulations and are modified in ensuing opinions with shifting levels of agreement among the justices. As Justice Breyer pointed out in. his Williams concurrence: “Answering the underlying general question . . . , and doing so soon, /is important. Trial judges in both federal and state courts apply and interpret hearsay rules as part of their daily trial work. . . . Obviously, judges, prosecutors, and defense lawyers have to know, in as definitive a form as possible, what the Constitution requires so that they can try their cases accordingly. [][] The several different opinions filed today embody several serious, but different, approaches to the difficult general question. Yet none fully deals with the underlying question as to how, after Crawford, Confrontation Clause ‘testimonial statement’ requirements apply . . . .” (Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2248] (conc. opn. of Breyer, J.).) The problem is reflected in the various opinions our court offers here.
Nevertheless, a majority of the Supreme Court has propounded a series of rules founded squarely on a federal constitutional guarantee. Lower courts *649 must conscientiously apply those constitutionally mandated principles, as best we can discern them, whether or not we agree with their wisdom or their logic.
Liu, L, concurred.
Appellant’s petition for a rehearing was denied December 12, 2012, and the opinion was modified to read as printed above. Corrigan, J., was of the opinion that the petition should be granted.

 The circumstances surrounding the prosecution’s decision to call Dr. Lawrence, rather than presenting Dr. Bolduc and subjecting him to cross-examination, certainly raise concerns.

 See Evidence Code section 1200, subdivision (a), which provides that “ ‘[h]earsay evidence’ is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.”

 Two points are important here. There are, of course, many instances in which out-of-court statements are not offered for their truth. The long-standing rule that unless a statement is admitted for its truth it is not hearsay remains unchanged. The question is whether a statement is admitted for its truth. When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that statement to the jury, a majority of the high court in Williams, supra, 567 U.S._[132 S.Ct. 2221], rejects the premise that the out-of-court statement is not admitted for its truth.
Second, it should be noted that Crawford and its progeny are grounded squarely in the Sixth Amendment, which provides that “[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him . . . .” Thus, the Crawford limitations do not apply in civil cases nor do they apply when evidence is not offered against a criminal defendant.

 Of course there are several ways in which the statements are not comparable. An autopsy report reflects the examination of a dead body rather than a live patient. The autopsy surgeon is conducting an official inquiry, while a physician is treating his or her patient, not assisting in a governmental investigation.

 The high court made clear that the content of a statement may be quite important in determining the primary purpose for which it is made. (See, e.g., Bryant, supra, 562 U.S. at pp. - . - [131 S.Ct. at pp. 1160-1161, 1165-1166].)

 Justice Thomas cautioned that such a test must be coupled with the solemnity requirement. Otherwise “it sweeps into the ambit of the Confrontation Clause statements that lack formality and solemnity and is thus ‘disconnected from history.’ ” (Williams, supra, 567 U.S. at p. __ [132 S.Ct. at p. 2261] (conc. opn. of Thomas, J.).)

 In Bullcoming, supra, 564 U.S. _ [131 S.Ct. 2705], Justice Ginsburg, writing for the majority, included this footnote: “To rank as ‘testimonial,’ a statement must have a ‘primary purpose’ of ‘establishing] or prov[ing] past events potentially relevant to later criminal prosecution.’ ” (Id. at p._, fn. 6 [131 S.Ct. at p. 2714, fn. 6], quoting Davis, supra, 547 U.S. at p. 822.) Justice Thomas, a member of the majority, did not join in the footnote.

 For example, the majority noted, “[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry.” (Bryant, supra, 562 U.S. at p._[131 S.Ct. at p. 1158].) “In determining whether a declarant’s statements are testimonial, courts should look to all of the relevant circumstances.” (Id. at p._[131 S.Ct. at p. 1162].)

 As the majority explained in Bryant. “This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in Davis, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude ‘the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.’ ” (Bryant, supra, 562 U.S. at pp. - [131 S.Ct. at pp. 1159-1160], fn. omitted.)

 1 note that because defendant had already confessed to strangling Pina at the time Dr. Bolduc prepared his autopsy report, the primary purpose formulation embraced by the Williams plurality is also satisfied. The autopsy statements were made for the primary purpose of accusing a targeted individual, the confessing defendant. (See Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2242] (plur. opn. of Alito, J.).)

 1 assume Detective Paine, who attended the autopsy, could have authenticated the autopsy photographs.

 Dr. Lawrence might have testified that he could base his opinion on nonhearsay photographs. He did not. Had he done so, his claims that the photographs were sufficient for that purpose would have been subject to cross-examination as well as being potentially rebuttable by independent defense evidence to the contrary.

 See, for example, the concurring opinion of Chief Justice Rehnquist, joined by Justice O’Connor in Crawford, supra, 541 U.S. at pages 69-76; the dissenting opinion of Justice Kennedy, joined by Chief Justice Roberts, and Justices Breyer and Alito, in Melendez-Diaz, supra, 557 U.S. at pages 330-357; and the concurring opinion of Justice Breyer in Williams, supra, 567 U.S. at pages - [132 S.Ct. at pp. 2244-2255],